```
 1            IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3

 4                        ---:---

 5  GRAMERCY GROUP, INC.,        ) Civil No.
                                 ) 16-00114-JMS-KSC
 6            Plaintiff,         )
                                 )
 7       vs.                     )
                                 )
 8  D.A. BUILDERS, LLC a/k/a     )
    D.A. BUILDERS; DAVID A.      )
 9  ALCOS III; JOHN DOES 1-20,   )
    JANE DOES 1-10; DOE          )
10  CORPORATIONS 1-10; DOE       )
    PARTNERSHIPS 1-10; and       )
11  OTHER ENTITIES 1-10,         )
                                 )
12            Defendants.        )
    _____    )
13

14

15          VIDEOTAPED DEPOSITION OF DAVID ALCOS

16  Taken on behalf of Plaintiff Gramercy Group, Inc. at

17  Bays Lung Rose & Holma, Topa Financial Center, 700

18  Bishop Street, Suite 900, Honolulu, Hawaii,

19  commencing at 9:00 a.m. on November 24, 2017 pursuant

20  to Notice.

21

22

23

24

25  Before:   WILLIAM T. BARTON, RPR, CSR NO. 391
```

EXHIBIT 1

```
 1   APPEARANCES:

 2       For Plaintiff
         Gramercy Group, Inc.
 3           HARVEY J. LUNG, ESQ.
             Bays Lung Rose & Holma
 4           Topa Financial Center
             700 Bishop Street, Suite 900
 5           Honolulu, Hawaii 96813
             (808) 523-9000
 6           hlung@legalhawaii.com

 7       For Defendants
         D.A. Builders, LLC a/k/a D.A. Builders and
 8       David A. Alcos, III
             DANA A. BARBATA, ESQ.
 9           Cades, Schutte LLP
             1000 Bishop Street, Suite 1200
10           Honolulu Hawaii 96813
             (808) 521-9200
11           dbarbata@cades.com

12        Videographer
             Alan Nielson

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        Q.   Have you ever reviewed the Sage and

 2   Associates report?

 3        A.   I viewed it.

 4        Q.   In that report, they have as part of their

 5   calculations of damages, they have a 2 percent fee

 6   for Gene Lum calculated into the damages.

 7             Did you see that?

 8        A.   I don't remember, but yeah.

 9        Q.   So did you tell them about your arrangement

10   that you don't have to pay the entire 2 percent?

11        A.   No, I did not.

12        Q.   So as far as you know, Sage does not know

13   about this arrangement that you can pay less than the

14   2 percent; is that correct?

15        A.   That's correct.

16        Q.   Other than introducing you to Gramercy, is

17   the $20,000 payment for anything else?

18        A.   No.

19        Q.   Did Mr. Lum also introduce you to a person

20   by the name of Robert Aiu?

21        A.   He did -- no, wait.  Hold on.  He did not.

22        Q.   Who introduced you to -- have you ever been

23   introduced to Mr. Robert Aiu?

24        A.   Yes, I did.

25        Q.   Who introduced you to him?
```

1          A.   Myself.

2          Q.   So you just introduced yourself to Mr. Aiu?

3          A.   I went -- go seek out RICO.   So when I

4    seeked out RICO, Mr. Aiu was the case manager at that

5    time.

6          Q.   Okay.   And when you met with Mr. Aiu, wasn't

7    Mr. Lum also there?

8          A.   He did show up.

9          Q.   And how did he come to show up for that

10   meeting?

11         A.   To -- I called him up to verify the

12   conversations that I had with Gramercy.

13         Q.   And you asked him to attend the meeting with

14   Mr. Aiu?

15         A.   With myself, yes.

16         Q.   Was part of the $20,000 fee that you paid to

17   Mr. Lum also to thank him for his assistance in

18   helping you with the RICO complaint that you made?

19         A.   No.

20         Q.   So you did not compensate him for his

21   assistance with respect to RICO?

22         A.   No.   I didn't give him anything from that

23   time, I told you.

24         Q.   Did you know Mr. Aiu before you went to

25   RICO?

1      A.    No.

2      Q.    So how did Mr. -- to your knowledge, how did

3    Mr. Aiu get assigned to your case?

4          MS. BARBATA:   Objection.   Calls for

5    speculation.

6      A.    I walk in there and looked for someone that

7    could handle this case, and he was the guy.

8      Q.    Was he the guy who met you, or you met

9    somebody else first?

10     A.    I don't remember.   I believe that was the

11    only guy I were in conversation with.

12     Q.    Did you fill out a written complaint with

13    RICO?

14     A.    Yes.

15     Q.    And you filled it out before meeting with

16    Mr. Aiu?

17     A.    Yes.

18     Q.    Did you meet with anyone else from RICO

19    other than Mr. Aiu?

20     A.    I don't remember.

21     Q.    Did Mr. Aiu interview you?

22     A.    He did.

23     Q.    Did he interview Mr. Lum?

24     A.    Yes, he did.

25     Q.    In your presence?

94

1        A.    In my presence.

2        Q.    Did Mr. Aiu interview anybody else from DA

3    Builders?

4        A.    I'm not sure if Travis was there or not, or

5    Tommy Chock.

6        Q.    Who is Mr. Chock?

7        A.    Tommy Chock was helping me in

8    administration, safety officer, as well as project

9    management a little.

10       Q.    During the IMP project?

11       A.    During the IMP project.

12       Q.    Is he still with DA Builders?

13       A.    No, sir.

14       Q.    When did he leave DA Builders?

15       A.    About a year ago.

16       Q.    Why did he leave --

17             MS. BARBATA:   Calls for speculation.

18       A.    Two years ago.  After the IMP project, we

19    downsized significantly.

20       Q.    And he left as part of the downsizing?

21       A.    Yes.

22       Q.    How many times did you meet, you personally

23    meet with Mr. Aiu?

24       A.    Less than five.

25       Q.    But multiple times?

1      A.   Yes.

2      Q.   What was the reason why you went to RICO in

3 the first place?

4      A.   I was afraid of Gramercy.

5      Q.   Why were you afraid of Gramercy?

6      A.   Gramercy is a demolition contractor.

7 Looking at New York they coming from, they played

8 like, I mean, a lot of demo guys or rubbish business

9 industries connected with the Mafia people.

10         And they were Italians.  They kind of ran

11 their business almost in a demanding, or to me, I

12 felt like bullying way that they were acting on the

13 job site many times.

14         And I was afraid that they were maybe coming

15 after me, illegally.  Maybe take me out, so that they

16 don't need pay all these open finances or bills or

17 claims; worried about my life, my family's life.

18      Q.   Any other reason why you went to RICO?

19      A.   Also to come after the finances, come after

20 the finances that Gramercy owed us.

21      Q.   You were looking for help from RICO as well?

22      A.   As well, yes.

23      Q.   Just for the record, when we say "RICO,"

24 we're talking about the Regulated Industries

25 Complaints Office under the Department of Commerce

1    and Consumer Affairs for the State of Hawaii.

2         A.   Yes, sir.

3         Q.   You mentioned that you went to RICO because

4    you were afraid of Gramercy, they were a demolition

5    contractor in New York, you believed that they might

6    have Mafia connections?

7         A.   Yes.

8         Q.   Did anything occur during, or did you have

9    any evidence whatsoever to suggest that Gramercy was

10   had a relationship with the Mafia?

11        A.   No evidence on their Mafia relationship.

12        Q.   Was the sole basis for your belief or being

13   fearful of them was because they were Italian and

14   they were from New York and they were in the

15   demolition business?

16        A.   I'm still fearful today.

17        Q.   What is the basis for the fear?

18        A.   They're Italian and they are in the

19   demolition business as we speak.

20        Q.   Are those the only facts you know that gives

21   rise to your fear?

22        A.   Their actions on how they terminated me from

23   the project.  How they just over -- just pushed me

24   out of the project and kind of overran me on the job.

25        Q.   Do you agree with me that being Italian and

1   being a demolition contractor in New York, is that a

2   stereotype?

3        A.   Do I agree with you it's a stereotype?  I'm

4   not a stereotype person.  You know, I don't know what

5   to think.  But just based on the finances and what

6   would happen to me, it did, a personal feeling

7   happened in that way.

8        Q.   Did anyone from Gramercy ever physically

9   threaten you or threaten you with physical harm?

10       A.   I would say not in a fighting way.  But

11  physically, I would say that the termination for, if

12  I didn't sign a contract or the second amendment

13  contract, I felt that Vinnie was really forceful in

14  demanding if I don't sign the second amendment

15  contract, he's going to terminate me and get me off

16  the job.  And if I did feel that that was a fear or a

17  harm, it is to me.

18            Now, he didn't say he was going to punch me

19  or kill me or anything.  But I did fear that if I did

20  not sign that contract, something might happen in

21  that extent.

22       Q.   But that was your own belief, it wasn't

23  something that somebody said to you?

24       A.   That is my own belief.

25       Q.   So would you agree with me then that your

 1    primary fear was because the stereotype of Gramercy

 2    being Italian and the demolition business and being a

 3    forceful contractor in New York?

 4              MS. BARBATA:   Objection.   Misstates

 5    testimony.

 6         A.   I did not fear Gramercy throughout the

 7    project -- in the beginning of the project.   When

 8    Gramercy was hurting DA Builders made me fear who

 9    Gramercy was and how were they acting.

10              That made me fear that, in the beginning, I

11    had no stereotype to Gramercy.

12         Q.   So it's only during the course of the job --

13         A.   That's correct.

14         Q.   -- that you developed that stereotype?

15         A.   Yes, sir.

16         Q.   Is there anything that occurred during the

17    course of the project that you can point to that

18    suggests that Gramercy ever intended you bodily harm?

19         A.   Not that I remember.

20         Q.   Was there anything that occurred during the

21    course of the project to lead you to believe that

22    Gramercy had Mafia or Mob ties with any organized

23    crime?

24              MS. BARBATA:   Objection.   Asked and

25    answered.

1    A.   Trish Lum might have told me that they have

2  some connections towards the Mafia side.

3    Q.   And did you ask her what the basis of that

4  belief was?

5    A.   No.

6    Q.   Did you believe her?

7    A.   Yeah.

8    Q.   Why did you believe her?

9    A.   She knew who Vinnie was, I guess.   I'm not

10  sure.   She knew, she recommend Vinnie or Gramercy to

11  DA Builders, to Gene Lum.   I guess she knew Vinnie as

12  a friend.

13    Q.   And so you thought that she would know

14  whether he was somehow connected to the Mob or to the

15  Mafia?

16    A.   Yeah.

17    Q.   Did you do anything to independent of Trish

18  Lum to verify whether she was correct or not?

19    A.   Yes.

20    Q.   What did you do?

21    A.   Google it.   Try to double check what

22  connections that they had.

23    Q.   Did you find anything to suggestion

24  Mr. Falciani or Gramercy was connected to the Mob or

25  the Mafia?

1    A.   No.

2    Q.   Did RICO tell you that they found any

3    connection between Gramercy and the Mob or the Mafia?

4    A.   Mr. Aiu had my case and they wanted to

5    proceed Gramercy.  And Mr. Aiu came to my office one

6    day and said, that thief -- people from higher up in

7    my office is shouting me down from pursuing this

8    case, I'm sorry to help you -- I mean, I'm sorry that

9    I can't help you.

10         And I really want to help you on this case,

11   and I think this is so messed up.  But it's higher

12   up.  It's stopping me from continuing on on this

13   case.  This like politics kind of stuff.  And that

14   makes me even more scared.

15         Because if RICO cannot support me and help

16   me because somebody in their system is telling to

17   stop, I feel like there's some kind of Mafia

18   connection or some kind of connection in this to not

19   pursue the case.

20         And he didn't tell me that he had no -- he

21   never have enough evidence or never have enough

22   facts.  He was apologizing how sorry he felt for his

23   company for stopping him.

24         MS. BARBATA:  We've been going for well over

25   an hour.  I know you had another question.

1            MR. LUNG:  I have another bunch of questions

2    relating to this line, but we can take a break

3    ten-minute break.

4            THE VIDEOGRAPHER:  We're going off the

5    record at 1125 a.m.

6            (Whereupon, a recess was taken from

7    11:25 a.m. to 11:37 a.m.)

8            THE VIDEOGRAPHER:  Back on record at

9    11:37 a.m.

10       A.   Harvey, for the record, I just want to make

11   a statement on the time frame of bidding that Gene

12   Lum gave us the plans to put a price on.  It was the

13   beginning of December, in that time frame.

14       Q.   Okay.  So are you saying the five proposals

15   based now on your recollection occurred during the

16   month of December 2014?

17       A.   Starting.

18       Q.   Okay.  Before the break -- and, Mr. Alcos,

19   you understand you're still under oath?

20       A.   Yes, sir.

21       Q.   Before the break, we were talking about your

22   discussions with RICO.  And you were last testifying

23   that at some point in that investigation, Mr. Aiu

24   told you that he was being stopped from further

25   investigating by higher-ups --

 1        A.   Yes?

 2        Q.   -- in the organization?

 3        A.   Yes, sir.

 4        Q.   And so by "higher-ups," you understood that

 5   to mean his bosses at RICO, correct?

 6        A.   And I'm not sure who else is involved.

 7        Q.   But is that who you, when you were

 8   testifying, that's who you were thinking of, his

 9   supervisors or superiors at Regulated Industries

10   Complaints Office?

11        A.   Yes.

12        Q.   Did you also think that that was coming from

13   the Department of Commerce and Consumer Affairs?

14        A.   I'm not sure where it was coming from.

15        Q.   Or the governor's office for the State of

16   Hawaii?

17        A.   I'm not sure.  At that time, I didn't think

18   of the governor.

19        Q.   Have you since thought it might be coming

20   from the governor's office?

21        A.   No.

22        Q.   Since that time, how high do you think the

23   decision to stop the investigation went?

24        A.   I have no idea.

25        Q.   Do you have any idea as to why Mr. Aiu's

1    higher-ups told him to stop his investigation?

2         A.   I can tell you what Mr. Aiu told me.  I

3    don't know what happened and why it happened, but

4    Mr. Aiu told me that he was this police officer or

5    FBI, DEA agent back in the days and he used to handle

6    a lot of these criminal cases back in -- back at one

7    time.

8              And when he told me that he was going to

9    take a look at this case, he really wanted to push

10   forward on looking at this case.  And he had to stop.

11        Q.   Because he was, his superiors told him to,

12   correct?

13        A.   Yes.

14        Q.   But you don't know what, why his superiors

15   told him to stop, correct?

16        A.   He was surprised.  He was, the way he

17   mentioned to me, he was surprised and shocked.

18        Q.   But my question to you is:  Do you know the

19   reason, did he give you a reason as to why his

20   superiors stopped him?

21        A.   He used it's above his head and he not sure

22   whatever politics or some kind of things going on.

23   He's not sure.

24        Q.   And so as you sit here today, you do not

25   know why his superiors told him to stop, correct?

104

1        A.   He did tell me that someone else is going to

2   be assigned to the case.

3        Q.   But I'm asking you as you sit here today,

4   you do not know the reason why his superiors stopped

5   him, correct?

6        A.   Him, himself, no, I don't know why.   But

7   according to the case, it was supposed to be pushed

8   through.   They didn't say they was going to stop the

9   case, but they was pulling him personally off the

10  case.

11       Q.   And you don't know the reason why they were

12  pulling him off the case?

13       A.   No.

14       Q.   And am I correct that it's purely

15  speculation on your part that the reason he was

16  pulled off the case was because of something Gramercy

17  did, correct?

18       A.   Correct.   I wouldn't say speculating.   I

19  would say that it is my opinion, what I feel like at

20  that time.

21       Q.   That what -- what are you talking about?

22       A.   I just felt like that's what Gramercy had to

23  play a role in this.

24       Q.   Well, do you have any facts, any actual

25  facts to support your belief that Gramercy caused

1    Mr. Aiu to be pulled off the case?

2        A.   The facts that I have is him getting

3    terminated from the project, from this case.

4        Q.   Is that the only fact you have to suggest

5    that Gramercy was involved?

6        A.   Yes.   Because another fact that Trish Lum

7    told me that Vinnie was connected to some kind of

8    Mafia thing.

9        Q.   But you never went out and did any

10   investigation to see whether what she told you was

11   correct?

12       A.   That's true.

13       Q.   Mr. Alcos, you strike me as being somebody

14   who, having been born and -- were you born and raised

15   in Hawaii?

16       A.   Yes.

17       Q.   Somebody who is born and raised in Hawaii,

18   you believe being honest and up front with people is

19   an important thing, correct?

20       A.   Yes.

21       Q.   And you're a person who believes that if you

22   say something, you're going to do it, correct?

23       A.   Yes.

24       Q.   And you wouldn't want to hurt somebody's

25   integrity if it was not something that was true; is

```
 1   that correct?

 2        A.   That is correct.

 3        Q.   So can you state for the record if you have

 4   a genuine belief today that Mr. Parziale is somehow

 5   connected to the Mafia or to the Mob, knowing that if

 6   you put this on the record, that it could damage his

 7   reputation?

 8        A.   That's the way I feel, yes.

 9        Q.   You feel that way?

10        A.   Yes.

11        Q.   What are the facts that lead you to believe,

12   and again, that Mr. Parziale is connected to the

13   Mafia or the Mob?

14        A.   His actions.  The way he treated me on the

15   job.  The way how RICO had to come off the case.  And

16   through Trish Lum's statement that they were

17   connected.

18        Q.   And as to the first of those, the way he

19   treated you, you already told me he never threatened

20   you physically, correct?

21        A.   The one I told you, yes, not physically that

22   he was going to beat me up or kill me or stuff.

23        Q.   He never told you that?

24        A.   He never tell me that.

25        Q.   And no one else ever told you that?
```

1        A.    No.

2        Q.    It's based solely on the fact that he was a

3    very forceful businessman; is that correct?

4              MS. BARBATA:    Action.   Misstates his

5    testimony -- misrepresents his testimony.

6        A.    His actions made me feel who he is.

7        Q.    Specifically tell me what actions you

8    believe makes you believe that he is part or

9    connected to the Mob or the Mafia.

10       A.    Just the way the whole project was in

11   general.  If, let's say -- it's hard to elaborate on

12   the action.  From financing, from terminating me to

13   holding off funds, from kicking off all my workers.

14   It was a lot of things that makes me feel that he's

15   connected.

16       Q.    There was a termination provision that was

17   in your subcontract, correct?

18       A.    Yes.

19       Q.    And under certain conditions of the

20   contract, Gramercy had a right to terminate you,

21   correct?

22       A.    In the contract?

23       Q.    Yeah.  Subcontract.

24       A.    Based upon the contract, there was a lot of

25   things in that contract that was turned into.  But

1      Q.   Under certain circumstances?

2      A.   Again --

3           MS. BARBATA:   Objection.   Calls for a legal

4   conclusion.

5      Q.   I'm not asking what the law is or what the

6   contract means.   I'm just asking what your

7   understanding was.

8           You understood that the subcontract

9   contained the termination clause and the clause that

10  allows Gramercy to hold back funds under certain

11  circumstances?

12     A.   I don't understand the meaning of the

13  termination clause or the termination in the

14  contract.

15     Q.   That's fine.   And I'm not asking whether you

16  understood it.

17          I just want you to confirm that you knew

18  they were in there?

19     A.   Yes.

20     Q.   And even though at the time you signed the

21  subcontract, you knew a termination and a hold-back

22  clause were in the subcontract, you're still saying

23  or testifying that the termination and Gramercy's

24  holding back of funds was because they're connected

25  to the Mafia, not because of the contract?

110

1        A.   No.   Try to repeat.

2             Gramercy's connected to the Mafia and not

3    because of the contract?

4        Q.   Yes.   You're saying, you testified that one

5    of three things that leads you to believe

6    Mr. Parziale or Gramercy's tied to the Mafia is

7    because of how he treated you.   And when I asked how

8    he treated you, you said because he terminated you,

9    he held back funds and kicks workers off the job,

10   right?

11       A.   Yes.

12       Q.   So I'm asking now, even though you still

13   feel that way, even though the contract allowed

14   Gramercy to terminate you under certain circumstances

15   and it allowed Gramercy to hold back funds under

16   certain circumstances, you're saying it wasn't

17   because of the contract, it was because of

18   Mr. Parziale's connections with the Mob?

19            MS. BARBATA:   Objection.   Misrepresents his

20   testimony.

21       A.   No, not at all.   I don't think it's because

22   of Vinnie's connection with the Mob.   I just think

23   that the way he acted was real bullying and

24   demanding, like John Giarrusso was a big guy as well

25   connected with Vinnie's decision on the job.

1        And he really felt like they were punks.  I

2   wouldn't want to say the bad word on here.  But they

3   were really, really not supporting DA Builders

4   throughout the whole project.

5        Q.   You know who Mr. Frank Falciani is?

6        A.   Yes.

7        Q.   He was with DCK?

8        A.   It makes me also feel scared of Frank

9   Falciani.

10       Q.   Because he's Italian?

11            MS. BARBATA:   Objection.   Argumentative.

12   Misstates his testimony.

13       A.   Because of their connections that they have

14   together, Vinnie and Frank has.

15       Q.   Did you believe that Mr. Falciani was a

16   bully during the course of the project on behalf of

17   DCK?

18       A.   I felt that a lot of subs did.

19       Q.   Did you?

20       A.   I did.

21       Q.   Did you feel that Mr. Falciani, because he

22   was a bully on the project and because he's Italian,

23   was also connected to the Mob?

24       A.   No, not because of their race.

25       Q.   But you felt he was connected to the Mafia?

112

1      A.   Yes.

2      Q.   Because of what?

3      A.   Just their relationship that Vinnie and

4  Frank has.

5      Q.   What was that relationship?

6      A.   Okay.  So this is what was from their

7  workers quoted me that Vinnie was a demolition -- a

8  rubbish man in the beginning.  And Frank Falciani

9  gave them a lot of work and built who Gramercy was

10  until the financial capacity of where they're at or

11  helped build Gramercy to where they're at, and they

12  was looking on to doing more other projects and jobs

13  together.  But that makes me feel that Frank and

14  Vinnie, from the beginning, was connected.

15      Q.   You knew they had done other projects

16  together?

17      A.   Yes.

18      Q.   Is there anything wrong with them having

19  done projects together?

20      A.   No, not at all.

21      Q.   So did you hold the fact that they had a

22  connection in doing prior projects together against

23  them?

24      A.   No.

25      Q.   But did you hold the fact that they had a

113

```
 1   relationship in the past, a professional business

 2   relationship, did you hold that against them?

 3        A.   Not at all.

 4        Q.   So how does that come up then to thinking

 5   that Mr. Falciani or Vinnie was connected to the

 6   Mafia?

 7        A.   When I got terminated from the project prior

 8   to getting termination, learning of their

 9   personalities, attitudes, their business forms, it

10   just felt like they were didn't care who you were on

11   the job site.  They didn't care whose fault it was.

12   Frank Falciani says, If you're not going to make this

13   deadline, we're not even paying you a dime.

14             He don't care who is holding you up.  He

15   don't care whose fault it is.  We're not going to

16   give you any cent to, and I'm not giving you any

17   money if you don't make the deadline.

18             And that was their attitude from the

19   beginning.  And Gramercy supported Frank Falciani

20   throughout the whole project.

21        Q.   And that is part of why you believe that

22   Gramercy has a relationship with the Mafia or the

23   Mob?

24        A.   No.  There was some -- there is -- I don't

25   know what makes me -- everything makes me believe to,
```

114

```
 1   every little thing that makes me believe there is a
 2   connection towards it.
 3       Q.   That Gramercy has a relationship with the
 4   Mob?
 5       A.   Yes.   Part of their workers were telling me
 6   they may have connections.
 7       Q.   Part of Gramercy's workers?
 8       A.   Yes.
 9       Q.   Which workers?
10       A.   Dan Leiro for one.
11       Q.   Who else?
12       A.   No, that's all I can remember.
13       Q.   And you had -- is this a direct conversation
14   you had with Mr. Leiro, or you heard it from somebody
15   else?
16       A.   That's direct conversation.
17       Q.   What exactly did Mr. Leiro say to you?
18       A.   I don't recall exactly what was the
19   conversation about.
20       Q.   As you sit here today, Mr. Alcos, is there,
21   other than your feelings and your sort of general
22   everything that happened on the job makes me believe
23   that Gramercy is connected to the Mafia, is there
24   anything concrete, definite that you can point to to
25   show a relationship between Gramercy and the Mafia?
```

1        MS. BARBATA:   Objection.   Asked and

2   answered.

3        A.   At this time, nothing else I can think of.

4        Q.   During your meetings with Mr. Parziale and

5   Mr. Giarrusso, did you tell them that DAB had the

6   construction qualifications to do the International

7   Market Place project?

8        A.   Yes, sir.

9        Q.   And you believe that to be true at the time

10   you stated that?

11        A.   Yes, sir.

12        Q.   And you wanted them to rely upon that,

13   correct?

14        A.   Yes, sir.

15        Q.   The first advancement of cash by Gramercy to

16   DAB, that occurred in the first part of 2015, to your

17   recollection?

18        A.   Yes.

19        Q.   Did that occur by you making a requisition

20   for payment for Gramercy for $250,000?

21        A.   No.

22        Q.   How did it happen?

23        A.   I probably just called and say if you can

24   give me something for startup fee.

25        Q.   And who did you speak with?

304

```
 1            I, DAVID ALCOS, hereby certify that I have

 2    read the foregoing typewritten pages; and

 3    corrections, if any, were noted by me; and the same

 4    is now an accurate and complete transcript of my

 5    testimony.

 6

 7                    Dated at_____Hawaii

 8                    this_____day of_____, 2017

 9

10            _____

11            DAVID ALCOS

12

13

14    Signed before me this_____day

15    of_____, 2017.

16

17

18    _____

19    Witness to Deponent's Signature

20

21    Gramercy Group, Inc. vs. D.A. Builders, LLC a/k/a,

22    D.A. Builders; David A. Alcos III

23    Civil No. 16-00114-JMS-KSC, November 24, 2017

24    by William T. Barton, RPR, CSR.

25
```

```
 1                    C E R T I F I C A T E

 2        I, WILLIAM T. BARTON, Certified Shorthand
      Reporter, do hereby certify:
 3
      That on November 24, 2017 at 9:00 a.m., there
 4    appeared before me DAVID ALCOS, the deponent whose
      deposition is contained herein; that prior to being
 5    examined was first by me duly sworn;

 6    That the deposition was taken down by me in machine
      shorthand and was thereafter reduced to typewriting;
 7    that the foregoing represents, to the best of my
      ability, a true and correct transcript of the
 8    deposition in the foregoing matter.

 9    That pursuant to Rule 30(e) of the Hawaii Rules of
      Civil Procedure, a request for an opportunity to
10    review and make changes to this transcript:

11    ___ X __Was made by the deponent or a party (and/or
      their attorney) prior to the completion of the
12    deposition.
      ___ _____Was not made by the deponent or a party
13    (and/or their attorney) prior to the completion of
      the deposition.
14    ___ _____Was waived.

15    I further certify that I am not an attorney for any
      of the parties hereto, nor in any way concerned with
16    the outcome of the cause named in the caption.

17        Dated this 29th day of November 2017 in
      Honolulu, Hawaii.
18

19    _____
                  WILLIAM T. BARTON, CSR No. 391
20                Certified Shorthand Reporter

21

22

23

24

25
```