IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GRAMERCY GROUP, INC.,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>D.A. BUILDERS, LLC a/k/a D.A. BUILDERS, et al.<br><br>　　　　　Defendants. | Civ. No. 16-00114 JMS-KSC<br><br>ORDER DENYING PLAINTIFF GRAMERCY GROUP, INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT, ECF NOS. 98, 100, 102 |

**ORDER DENYING PLAINTIFF GRAMERCY GROUP INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT, ECF NOS. 98, 100, 102**

**I. INTRODUCTION**

This case arises from a construction project (the "Project") at Honolulu's International Market Place (the "Property"). Gramercy Group, Inc. ("Gramercy") was the prime contractor on the Project. It entered into an agreement (the "Subcontract") with D.A. Builders, LLC ("DAB") to perform a portion of the Project work, but it terminated the Subcontract before the work was completed. In this action it seeks, among other things, a determination that the termination was proper. DAB disagrees and has filed a multi-count counterclaim.

Currently before the court are Gramercy's Motions for Summary Judgment on Count Eight of its First Amended Complaint ("FAC") and on all counts of DAB's Second Amended Counterclaim ("SACC").

## II. BACKGROUND

### A. Factual Background

Sometime after Gramercy had been engaged to do demolition and environmental work on the Project, it became interested in bidding for the drywall work as well, and it sought bids from local contractors to perform the work. Vincent Parziale ("Parziale") Dep. 28:22-29:1, 36:11-37:7, ECF No. 210-4. Acting as Gramercy's broker, Gene Kung Ho Lum ("Lum") met with DAB's owner David Alcos ("Alcos"). Lum Decl. ¶¶ 9, 18, ECF No. 210-1. Initially, Alcos told Lum that the job was too big for DAB to handle. Alcos Dep. 36:2-5, ECF No. 210-16. And Lum states in his declaration that he "could tell right away that [Alcos and DAB] were not prepared to handle a project of this size. DAB was small and [Alcos] did not have the experience. [Alcos] also could not get bonding." Lum Decl. ¶ 19. It was not until Lum proposed that Gramercy would make necessary cash advancements to fund DAB's work on the Project that DAB considered bidding for the job. Alcos Dep. 36:5-8, 39:4-21.

According to Lum, Parziale and John Giarrusso ("Giarrusso") of Gramercy "recognized that if they contracted with DAB, Gramercy would have to finance the Project because DAB did not have the capital to support the labor force, vendors, and materials." Lum Decl. ¶ 21. And Alcos asserts that Gramercy promised to provide such funding:

> [Giarrusso] repeatedly assured me that Gramercy "had my back", would "work the project together" and ensured that DAB "would not get hurt." [He] told me that Gramercy would pay DAB or the money would come from the owner of the Project . . . . And more specifically, [Parziale] told me that Gramercy would advance and furnish the capital to allow DAB to properly pay my employees and trade creditors . . . . There weren't any conditions attached to these promises.

Alcos Decl. ¶ 8, ECF No. 210-2.

DAB eventually bid for the work with the understanding that "Gramercy would be acting as a partner," with a "shared . . . goal of completing the project together." *Id*. ¶ 11. The alleged funding promises, however, were never reduced to writing and are not included in the Subcontract. *See id*. ¶ 15.

Likewise, DAB's final bid did not cover all of the expenses for which DAB contends it was promised payment. Specifically, it did not include costs associated with meeting "FM Global standards because the plans and specifications provided did not include that information." *Id*. at ¶ 12. According

3

to Alcos, however, Gramercy instructed DAB to tell general contractor dck/FWF ("DCK") that FM Global was included in the bid. *Id*. ¶¶ 3, 14. Alcos contends that Gramercy assured him that DAB would be paid for these costs (as well as others, including those associated with change orders, increases in DAB's scope of work, and overtime). *Id*. ¶¶ 17, 30-31. And he states that "Gramercy did not accept any of my requests to amend the [S]ubcontract, but they still promised me that they would advance me the necessarily (sic) capital to carry the job and cover the added FM Global costs." *Id*. ¶ 15.

Gramercy admits that it promised to provide some funding to DAB, but it disputes DAB's allegations about the scope of that promise. Gramercy's Vice President of Operations, Gregg Jenkinson ("Jenkinson"), testified that his "only understanding was that we were going to support [DAB] with payroll and we were going to advance [it] money for long lead or large procurement items. But I never understood that as a . . . permanent function." Jenkinson Dep. 10:20, 27:10-14, ECF No. 210-10. And at least initially, he did not understand the agreement to have been for the "full payroll." *Id*. at 28:7-8.

According to Alcos, "[o]ther than paying for FM Global, Gramercy was good about advancing the costs as promised up until November, 2015." Alcos Decl. ¶ 18. Beginning in November, however, Gramercy began funding only a

portion of DAB's gross payroll, yet it "ordered [DAB] to work overtime and . . . to submit change orders for work [it was] performing outside of [its] scope." *Id*. ¶¶ 20, 22. Alcos also contends that DAB was "getting pressured to make up for other trades' delays and to meet the February 25 back-of-the-house-milestone, so [he] was increasing [his] work force and asking them to work overtime." *Id*. ¶ 22.

Alcos "texted, emailed, and talked to [Jenkinson] about this shortfall a bunch of times." *Id*. ¶ 23. And "[i]n December, [Alcos] told [Jenkinson] that DAB would not be able to pay [its] state and federal taxes, and also wouldn't be able to cover all of the unions' requirements without Gramercy funding the gross payroll." *Id*. His repeated requests in January and February for full funding went unmet. *See id*. ¶¶ 24-32. And in February, Gramercy canceled the Subcontract. Notice of Termination ("Notice"), ECF No. 210-12.

The Notice, dated February 23, 2016, invokes the Termination Provision in paragraph twenty of the Subcontract, and terminates the Subcontract effective February 26, 2016. *Id*. As grounds for termination, the Notice states that DAB materially breached the Subcontract by failing to "properly prosecute and perform its work" and by failing to meet financial obligations to pay taxes, appropriate wages, union dues and fringe benefits, and amounts owed to vendors and subcontractors. *Id*.

5

In relevant part, the Subcontract's Termination Provision states:

> Should the Subcontractor become insolvent, the Subcontractor may be deemed to be in material breach of this Agreement. For the purpose of this paragraph . . . any failure to pay financial obligations as they become due including tax liability and union agreement fringe benefits, shall be deemed an act of insolvency. Further, the Contractor may deem this contract materially breached if the Subcontractor fails to properly prosecute and perform any part of its work, fails to exert its best performance efforts, becomes the subject of any claim of failure to pay the appropriate wage rates (including fringe benefits), or is terminated under any other contract with the Contractor.

Subcontract ¶ 20, ECF No. 99-6. The Subcontract also allows Gramercy to terminate for convenience:

> The Contractor shall have the right, by three (3) days written notice, to terminate and cancel this Agreement, without the Subcontractor being at fault, for its own convenience, and require the Subcontractor to stop work immediately. In such event, the Contractor shall pay the Subcontractor for that work actually performed in an amount proportionate to this Subcontract price. The Contractor shall not be liable to the Subcontractor for any other costs, including prospective profits on unperformed work.

*Id.* ¶ 32. And it includes a "conversion clause," providing that "[i]f it shall be determined that a termination for cause under this clause was wrongful or unjustified, such termination shall be deemed to be a termination for convenience." *Id.* ¶ 20.

Following the termination, Alcos came to believe that he had been "set up from the beginning," remembering "how Gramercy wouldn't accept a single one of my requested revisions to the [S]ubcontract" and finding "out later when Gramercy turned over documents that they terminated me to avoid paying me about $4million." Alcos Decl. ¶ 40. One of the "documents" Alcos is apparently referring to is a February 17, 2016 email from Frank Falciani, Managing Director for DCK, to Parziale and others, that states in relevant part:

> I think we can nurse [DAB] through the completion of the back-of-house areas. However, their big prize is Global FM and overtime reimbursement which total in excess of $4 million. They will make that claim at some time and try to leverage Gramercy into position to have to pay portions of that money to "keep them afloat". As you know I already own the Global FM and Schedule from Gramercy. Therefore this is a pure claim on behalf of [DAB]. I strongly suggest you start today to build the team with outside resources from the mainland who understand the work and will become acclimated to the project and details. Then if [DAB] threatens to walk off the job unless he gets paid their claim, you have a plan "B" working on the project and the concourse construction can continue. That is why it is essential to get through to April 1 with the turnover of the mall GLA and back-of-house, Saks façade and parking deck.

ECF No. 210-8.

///

///

## B. Procedural Background

Gramercy filed the FAC on May 27, 2016. ECF No. 15. Count I alleges a claim for breach of contract, *id*. ¶¶ 77-82, and Count VIII seeks declaratory relief as follows: (1) Gramercy properly terminated the Subcontract for cause based on DAB's material breach, (2) DAB may not enforce any provisions of the Subcontract and is liable to Gramercy "for any and all additional costs, expenses, attorneys' fees, and other damages, both liquidated and unliquidated, which directly or indirectly result from [DAB's] breach," and (3) DAB "is not entitled to the Unsupported Overtime Costs, the 'Unsupported FM Global Requirments Change Orders' or the change orders not approved or not paid to Gramercy by the Owner," (4) "Gramercy is entitled to offset any monies due to [DAB] with any back charge by the Construction Manager and Owner as well as any costs incurred by Gramercy to maintain the Project schedule or in its performance of work that was part of [DAB's] Subcontract," and (5) DAB must "defend, indemnify, and hold harmless Gramercy from any and all third party damages incurred as a result of [DAB's] material breaches" of the Subcontract. *Id*. ¶ 123.[1]

---

[1] The FAC also requests certain prospective relief, but that request appears to be moot at this time. *See* FAC ¶ 124.

DAB filed its SACC on March 20, 2017, alleging the following Counts: (1) Breach of Contract, (2) Negligent Misrepresentation, (3) Fraudulent Inducement, and (4) Unfair Trade Practices under Hawaii Revised Statutes ("HRS") § 480-2 (the "UMOC" claim). ECF No. 63.

Gramercy filed its Motions for Partial Summary Judgment on August 29, 2017. ECF Nos. 98, 100, 102. DAB filed an Omnibus Opposition to the Motions on January 8, 2018. ECF No. 209. And Gramercy filed separate Replies on January 11 and 12, 2018. ECF Nos. 213-215.

A Hearing was held on March 5, 2018.

### III. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden initially lies with the moving party to show that there is no genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue of fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex*, 477 U.S. at 323-24. "There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Celotex*, 477 U.S. at 322). Moreover, there is no genuine issue of material fact if, taking the record as a whole, a rational trier of fact could not find in favor of the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Taylor*, 880 F.2d at 1045.

# IV. DISCUSSION

## A. Propriety of the Termination and Breach of Contract

Gramercy asks the court to declare its termination of the Subcontract proper as a matter of law and enter judgment in its favor on Count VIII of the FAC and on Count I of the SACC.[2] ECF Nos. 98, 102. It asserts that it terminated the Subcontract because it discovered that "DAB was not adequately performing its work on the Project[,] . . . would not meet a critical February 25, 2016 benchmark required under the Subcontract . . . [and] had significant debts to vendors and creditors at the Project." Pl's Mem. at 4, ECF No. 98-1. It argues that it properly terminated the Subcontract for cause based on these things, but it contends that even if termination for cause was wrongful, it properly terminated DAB for convenience. *Id*. at 4-5. It also contends that DAB breached the Subcontract by failing to pay taxes, union dues and benefits, and money owed to vendors and suppliers, and by failing to indemnify Gramercy in lien actions brought by unpaid vendors. Pl.'s Mem. at 5, ECF No. 102-1.

In response, DAB admits that it became insolvent under the terms of the Subcontract by failing to pay vendors, taxes, wages, and union obligations, and

---

[2] Although Gramercy asks for a declaration that DAB breached the Subcontract, it has not expressly requested that the court enter summary judgment on Count I of the FAC. *See* Pl.'s Mots. and supporting Mems. ECF Nos. 98, 98-1, 102, 102-1.

it also admits that it failed to indemnify Gramercy in two lien actions filed by unpaid vendors. Opp'n at 19. But it contends that its insolvency was occasioned by Gramercy's failure to honor its promise to fund DAB's payroll and materials expenses. *Id*. at 19-24. It argues that Gramercy may not rely on DAB's breach to excuse Gramercy's performance when Gramercy caused DAB's breach in the first place. *Id*. It further argues that Gramercy terminated the Subcontract in bad faith. *Id*. at 24-29.

Gramercy counters that DAB was the first to breach because it had "outstanding tax liabilities to both the State of Hawaii and the Federal Government" at the time of execution. Pl.'s Mems. at 3-4, ECF Nos. 213, 215. But insolvency under the Subcontract is forward looking — it allows termination "[s]hould the Subcontractor become insolvent," not based on already existing liability. Subcontract ¶ 20. Thus, the court rejects this argument.

At oral argument, it further contended that regardless of whether DAB was in breach at execution, it breached immediately thereafter by becoming insolvent and unable to cover its expenses — i.e. before November, when DAB contends Gramercy began to fall short on its alleged funding obligation. And Gramercy's Motion asserts that DAB owed substantial taxes in the Second, Third, and Fourth Quarters of 2015, had fallen significantly behind on its union

obligations by December 2015, and had outstanding debt to vendors, subcontractors, and suppliers, some of which dated back as far as October 2015. Pl.'s Mem. at 5-6, ECF No. 102-1.

It is a basic principle of contract law that "'a party who breaches or causes the other party to breach an agreement cannot enforce the agreement to his or her benefit.' . . . In other words, if a party is responsible for another party's lack of performance, he cannot successfully assert a breach of contract claim for damages." *Furuya v. Ass'n of Apartment Owners of Pac. Monarch, Inc.*, 137 Haw. 371, 385-86, 375 P.3d 150, 164-65 (2016) (quoting *Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Haw. 286, 300, 141 P.3d 459, 473 (2006)); *see also Kahili, Inc. v. Yamamoto*, 54 Haw. 267, 272, 506 P.2d 9, 12 (1973) ("The general rule is that where a person by his own act makes impossible the performance or the happening of a condition such nonperformance should not relieve him from his obligation under a contract."). Moreover, "[t]he doctrine of equitable estoppel is firmly established as part of [Hawaii] law." *Filipo v. Chang*, 62 Haw. 626, 633, 618 P.2d 295, 299 (1980); *see also Fred v. Pac. Indem. Co.*, 53 Haw. 384, 387-88, 494 P.2d 783, 786-77 (1972) (describing the "comprehensive doctrine of equitable estoppel" as including promissory estoppel and estoppel by conduct); *Rosa v. CWJ Contractors, Ltd.*, 4 Haw. App. 210, 218 & n.12, 664 P.2d 745, 751 & n.12 (1983)

(tracing the development of equitable estoppel and explaining that it includes estoppel by misrepresentation or concealment as well as "quasi-estoppel which has its basis in election, waiver, acquiescence, or an acceptance of benefits," and includes judicial estoppel). Under that doctrine, a party may not "maintain inconsistent positions or . . . take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action." *Id.* at 218, 664 P.2d at 751 (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 68, at 694-95 (1966)).

First, Gramercy has failed to meet its initial burden of showing no material dispute as to the quality and timeliness of DAB's work. The only evidentiary support it offers for this contention is Parziale's Declaration that "Gramercy became aware that DAB was not adequately performing its work on the Project," and it "became clear that DAB would not meet a critical February 25, 2016 benchmark." *See* Pl.'s Concise Statement of Facts, ¶¶ 7-8, ECF No. 99; Parziale Decl. ¶¶ 4-5. But Alcos stated in his declaration that Parziale and others "all agreed [it] was likely" that DAB would meet the February 25 deadline. Alcos Decl. ¶ 31. And Parziale admitted during his deposition that he "didn't get involved in the project on a day-to-day basis at all" and had no personal knowledge

14

about manpower issues. Parziale Dep. 117:17-24, ECF No. 210-4. Thus, the court finds Gramercy is not entitled to judgment as a matter of law that DAB's work was substandard or untimely.

Next, given the record described above, the court finds obvious questions of fact exist as to the scope of Gramercy's promise to fund DAB's operations, whether Gramercy breached its promise to fund, and whether that breach led to DAB's failure to meet its financial obligations under the Subcontract. Ample evidence also exits that when Gramercy entered into the Subcontract, it knew DAB would be unable to pay its bills on the Project without Gramercy's help, and it promised to provide funding in order to induce DAB to contract with it. Based on this record, and absent evidence of a material change in DAB's financial condition (from the time the Subcontract was executed) that was *undisputedly not caused by Gramercy itself*, the court cannot conclude as a matter of law that Gramercy properly terminated the Subcontract based on DAB's insolvency under the Subcontract.

Nor can the court find as a matter of law that Gramercy's termination of the Subcontract was a proper termination for convenience. Under federal law, where principles of termination for convenience first developed in the context of government contracts, "[a] contracting officer may not terminate for convenience

15

in bad faith, for example, simply to acquire a better bargain from another source." *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (describing the historical development of termination for convenience). And a party that enters into a contract "knowing full well that it will not honor the contract . . . cannot avoid a breach claim by adverting to the convenience termination clause." *Id*. (quoting *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990), and citing *Torncello v. United States*, 681 F.2d 756 (Ct. Cl. 1982)).

Although Hawaii has not yet addressed the limits of termination-for-convenience clauses, it has long recognized an implied covenant of good faith and fair dealing existing in contracts. *Best Place, Inc. v. Penn Am. Ins. Co.*, 82 Haw. 120, 123-24, 920 P.2d 334, 337-38 (1996). And presumably, it would at least require good faith in a party's invocation of a termination-for-convenience provision. As the Third Circuit has explained, "unbounded" discretion in this context would "brush up against the problem of allowing [a party] to create an illusory contract." *Linan-Faye Constr. Co. v. Housing Auth. of City of Camden*, 49 F.3d 915, 924 (3d Cir. 1995); *see also Triangle Mining Co v. Stauffer Chem. Co.*, 753 F.2d 734, 738 (9th Cir. 1985) ("Good faith . . . 'requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do

so arbitrarily or capriciously.'" (quoting *Rao v. Rao*, 718 F.2d 219, 223 (7th Cir. 1983))).

Gramercy contends that "[t]here is no material question of fact that [it] terminated DAB in good faith." Pl.'s Mem. at 9, ECF No. 98-1. But as explained below, and viewing the evidence in the light most favorable to DAB, a reasonable juror could conclude that Gramercy terminated the Subcontract in an effort to avoid its promise to fund DAB's payroll and cover expenses for FM Global compliance. Rather, it relies on a completely unsubstantiated assertion that "Gramercy and DAB had reached a point that work under the Subcontract could not proceed," a conclusory statement that "Gramercy had no other reasonable choice but to terminate DAB," and its proposed Amendment to Subcontract Agreement and General Release, ECF No. 210-11, the contents of which it claims are inadmissible, *see* Pl.'s Mem. at 20, ECF No. 100. Pl.'s Mem. at 9, ECF No. 98-1. Thus it has not carried its burden of showing the absence of factual questions as to its good faith in exercising its termination rights.

Because material questions of fact exist as to the propriety of Gramercy's termination of the Subcontract and as to DAB's breach-of-contract claim, the Motions for Partial Summary Judgment on these issues are DENIED.

**B.     Fraudulent Inducement, Negligent Misrepresentation, and UMOC**

Under DAB's theory of the case, Gramercy falsely promised to fully fund DAB's payroll and cover its FM Global expenses without ever intending to follow through on those promises.  *See* Opp'n at 3, 40.  It has alleged claims for Fraudulent Inducement, Negligent Misrepresentation, and UMOC all based on that theory.  Gramercy contends that all three claims must fail because DAB cannot prove Gramercy's intent at the time it allegedly made the promises.[3]  Pl.'s Mem. at 2.  But it cites no authority for its contention that "direct" evidence is necessary to show intent, *see* Reply at 6, ECF No. 214, and sufficient circumstantial evidence exists to create a material question of fact on the issue.

Although usually stated in the criminal context, "[i]t is an elementary principle of law that intent may be proved by circumstantial evidence; that the element of intent can rarely be shown by direct evidence; and it may be shown by

---

[3] In its Motion, Gramercy also argues that DAB cannot prove the alleged promises were made, but it appears to abandon that argument in its Reply.  *See* Pl.'s Mem. at 14, ECF No. 100-1; Reply, ECF No. 214 at 4-10.  Moreover, as described above, ample evidence exists to create a material question of fact as to the nature and scope of Gramercy's promises.
 Additionally, at the hearing, Gramercy attempted to expand its argument regarding DAB's UMOC claim, contending that DAB is unable to show a negative effect on competition.  *See Gurrobat v. HTH Corp.*, 133 Haw. 1, 21, 323 P.3d 792, 812 (2014) (requiring a plaintiff allege that "he or she was harmed as a result of actions of the defendant that negatively affect competition").  The court does not consider this argument, however, as it was not included in the underlying Motion.
 Likewise, the court makes no determination at this time regarding whether DAB's Negligent Misrepresentation Claim may ultimately proceed based solely on Gramercy's allegedly fraudulent misrepresentations.

reasonable inference arising from the circumstances surrounding the act." *State v. Yabusaki*, 58 Haw. 404, 409, 570 P.2d 844, 847 (1977); *see also Achiles v. Cajigal*, 39 Haw. 493, 496 (Haw. Terr., 1952) ("It is seldom that the fraudulent intent . . . can be proved by direct evidence. Nor does the law require it to be so proved."). Moreover, present intent may be shown by later contradictory conduct. *See Haw. Cmty. Fed. Credit Union v. Keka,* 94 Haw. 213, 230, 11 P.3d 1, 18 (2000).

The plaintiffs in *Keka* alleged that they had entered into a mortgage loan agreement containing a nine percent interest rate based on the loan officer's representation that it would be "no problem" to lower the interest rate at a later date. *Id*. at 217, 11 P.3d at 5. Yet a year later, the loan officer responded to their request to lower the rate by stating something "to the effect that it would be 'too much trouble' to do so." *Id*. at 230, 11 P.3d at 1. The Hawaii Supreme Court found this statement was sufficient to create a question of fact as to whether the promise had been illusory. *Id*.

Here, a question of fact exists based on Gramercy's actions both at the time the alleged promises were made and later. According to Alcos, Gramercy refused to put its promises in the Subcontract, and it told Alcos to lie to DCK about whether FM Global was included in its bid. Further, Gramercy has pointed to no

19

material change in circumstances between its alleged promise to fund DAB, its initial full funding of DAB's payroll, and when it began to withhold funds. Considered in a light most favorable to DAB, a reasonable jury could infer from these facts that Gramercy never intended to fulfill its promises.[4]

## V. CONCLUSION

For the foregoing reasons, Gramercy's Motions for Partial Summary Judgment are DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 9, 2018.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Gramercy Grp., Inc. v. D.A. Builders, LLC*, Civ. No. 16-00114 JMS-KSC, Order Denying Plaintiff Gramercy Group Inc.'s Motions for Partial Summary Judgment, ECF Nos. 98, 100, 102

---

[4] Given that this inference is possible without considering the "Amendment to Subcontract Agreement and General Release," ECF No. 210-11, the court need not determine the admissibility of that document at this time.